STAR–CHRONICLE PUB. CO. v. UNITED PRESS ASS'NS.

(Circuit Court of Appeals, Eighth Circuit.    March 3, 1913.)

No. 3,851.

**1. CORPORATIONS (§ 642*) — FOREIGN CORPORATIONS — DOING BUSINESS IN STATE — INTERSTATE BUSINESS.**

A contract between a press association, incorporated and having its headquarters in New York, and a newspaper company in St. Louis, Mo., by which the association furnished for the use of the paper daily over its leased wires, largely from one of its main offices in Chicago, news gathered by it throughout the several states and in foreign countries, related entirely to interstate business, and although the association maintained an office and an operator in the building of the newspaper company, under the decisions of the Supreme Court of the state, it was not within Rev. St. Mo. 1909, §§ 3039, 3040, relating to foreign corporations doing business in the state, and which provide that no action shall be maintained by such a corporation, which has not complied with their provisions.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2520–2527; Dec. Dig. § 642.*

Foreign corporations doing business in state, see notes to Wagner v. J. & G. Meakin, 33 C. C. A. 585; Ammons v. Brunswick-Balke Collender Co., 72 C. C. A. 622.]

**2. CONTRACTS (§ 217*) — NOTICE TO TERMINATE CONTINUING CONTRACT — SUFFICIENCY.**

Where a continuing contract required 60 days' notice for its termination, a letter written by one party to the other, stating that it was its present intention to terminate the contract, was insufficient as such notice.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1005–1009; Dec. Dig. § 217.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. DAMAGES (§ 124*)—MEASURE OF DAMAGES—BREACH OF CONTRACT.

　　Plaintiff, a press association, having in operation an established and extensive system and equipment for collecting and distributing news, contracted to furnish news to defendant, a newspaper company, for a fixed term at a stated price per week. Before the expiration of the term defendant refused to longer receive and pay for the service. It was shown that the only additional expense incurred by plaintiff by reason of the contract was the cost of maintaining an office in defendant's building, with an operator who took dispatches from a main wire operated by plaintiff, which passed through the city, and transcribed the same for defendant's use. *Held*, that the measure of damages recoverable by plaintiff for breach of the contract was the difference between what it was to receive under the contract and the cost of maintaining such office.

　　[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 326–338; Dec. Dig. § 124.*]

In Error to the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Action at law by the United Press Associations against the Star-Chronicle Publishing Company. Judgment for plaintiff, and defendant brings error. Reversed, with leave to plaintiff to file remittitur.

Shepard Barclay, of St. Louis, Mo. (William R. Orthwein, P. H. Cullen, and Thomas T. Fauntleroy, all of St. Louis, Mo., on the brief), for plaintiff in error.

G. B. Arnold, of St. Louis, Mo. (Jay W. Curts, of Cincinnati, Ohio, and Campbell Cummings, of St. Louis, Mo., on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and WM. H. MUNGER and TRIEBER, District Judges.

WM. H. MUNGER, District Judge. On the 12th day of September, 1908, at New York City, in the state of New York, the United Press Associations, a corporation, organized under the laws of the state of New York, was engaged in the business of gathering news throughout the different states of the United States, as well as through foreign countries, preparing news reports thereof in the city of New York and at other points, for distribution throughout the several states, and selling and contracting for the right and privilege of publishing said news reports by the owners and publishers of various newspapers throughout the United States, and delivering, by telegraphic communication, from said city of New York, Chicago, Ill., and other points of distribution in the several states, such reports to such publishers.

On said 12th day of September, 1908, said United Press Associations, in the city of New York, in the state of New York, entered into a contract with the Star-Chronicle Publishing Company, a corporation organized under the laws of the state of Missouri, by the terms of which said United Press Associations sold to the Star-Chronicle Publishing Company the privilege of publishing in the Sunday Star and Chronicle, a newspaper printed in the English language at St. Louis, Mo., on Sundays, the full Saturday night reports of the United Press

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Associations, and agreed to deliver to the Star-Chronicle Publishing Company its news reports, foreign and domestic, so far as it was practicable to do. The contract provided that, in all cases of rebate granted by the telegraph company on account of wire trouble, the Star-Chronicle Publishing Company was to receive the same, provided that said full Saturday night report of the United Press Associations should be filed for the Star-Chronicle Publishing Company at Chicago, Ill., or elsewhere, if the Star-Chronicle Publishing Company so elected. The Star-Chronicle Publishing Company agreed to receive and accept said news reports, publishing such parts thereof as it might desire, and to pay to the United Press Associations at its office $25 per week; and the Publishing Company agreed to furnish the Press Associations the local news within 15 miles of the office in which the Publishing Company's newspaper was published, without cost to the Press Association. Said contract contained the following provision:

"This agreement shall continue for 12 months from the date hereof, and shall thereafter renew itself for like periods until either party has notified the other at least 60 days before the end of any of said periods of its desire to terminate this agreement."

Subsequently, and on the 9th day of November, 1908, at New York City, in the state of New York, the same parties entered into another agreement of the same character, by the terms of which the United Press Associations sold to the Publishing Company the right and privilege of publishing in the Star and Chronicle, a newspaper printed in the English language, at St. Louis, Mo., daily except Sundays, the full day report of the United Press Associations, and agreed to deliver to the said Publishing Company its news reports, foreign and domestic, so far as practicable. The contract contained the same provisions with regard to rebates granted by the telegraph company and the reports to be filed for said Publishing Company at Chicago, Ill., or elsewhere, if it so elected, and its automatic renewal unless notice was given, etc., and the Publishing Company agreed to receive and accept said news reports and pay for the same $153 per week.

The Press Associations delivered such news to the Publishing Company pursuant to said contracts, and the same were received and paid for by the Publishing Company up to and including the week ending September 3, 1910, and the Press Associations delivered to the Publishing Company and the Publishing Company received said reports, under said contracts, for a period of 9 weeks after September 3, 1910, for which 9 weeks service the Publishing Company failed and refused to pay. On the 14th day of December, 1910, said Press Associations (as plaintiff) instituted its suit in the United States court for the Eastern judicial district of the state of Missouri, against said Publishing Company (as defendant), stating in its petition that there was due it from the defendant, on the contract of September 12, 1908, for the service which it rendered for the 9 weeks after the 3d of September, 1910, the sum of $225. and further alleged that, on the 9th day of November, 1910, defendant, without any just cause or lawful excuse, and against the consent of the plaintiff, refused to receive and accept from plaintiff said news reports and news service, and repudiated and abandoned said agreement; that plaintiff had been ready and willing

to perform all the terms of the contract on its part to be performed up to the expiration of the contract, September 12, 1911; that it had sustained damage by reason of the breach of the contract on the part of the defendant to receive and accept such news reports, in the sum of $836, and it asked judgment for both of said amounts, with interest upon the $225.

It also alleged in its petition, as a further and second cause of action, that there was due it under the contract of date November 9, 1908, for the news which it had furnished under the contract, and which was received and accepted by the defendant, the sum of $1,453.50, and it further alleged a breach of the contract by the defendant, on November 9, 1910, in the same manner as before stated in the first cause of action, and that it was damaged by reason thereof in the sum of $6,-533.80, and it prayed judgment upon its claims arising under said contract of November 9, 1908, for the sum of $1,453.50, with interest, and the additional sum of $6,533.80.

To this petition the Publishing Company answered, stating, in substance: First. That by the terms of the contract some of the business was to be done in the state of Missouri; that plaintiff did in fact do a great deal of its business wholly in the state of Missouri; that it had not complied with the statute of the state of Missouri and obtained a license authorizing it as a foreign corporation to transact business in said state; and that, because of such failure to comply with the statutes of the state of Missouri, no actions could be maintained upon said contract. Second. That the contract had been terminated by a notice given by the defendant to the plaintiff 60 days prior to the expiration of the contract. Third. The answer alleged a settlement and adjustment. Fourth. A general denial.

The case was tried to a jury, and a verdict returned in favor of plaintiff for the sum of $1,678.50, with interest thereon on the first count of the petition, and for $6,533.80 on the second count of the petition. The defendant has brought the case here for review.

[1] The first question to be determined is whether or not the plaintiff, because of not having complied with the provisions of the statute of the state of Missouri, relative to transacting business within the state by foreign corporations, can maintain an action to recover upon said contract. This requires a consideration of the nature of the contracts and the business performed by the plaintiff in the state of Missouri, respecting the fulfillment of the contracts. The applicable provisions of the statutes of Missouri are sections 3039 and 3040, Revised Statutes 1909, which sections contain the following provisions:

"Sec. 3039. * * * Every company incorporated for the purpose of gain under the laws of any other state, territory or country, now or hereafter doing business within this state, shall file in the office of the Secretary of State a copy of its charter or articles of association, duly authenticated by the proper authority, together with a sworn statement under its corporate seal, particularly setting forth the business of the corporation which it is engaged in carrying on, or which it proposes to carry on in this state; and the principal officer or agent in Missouri shall make and forward to the Secretary of State, with the affidavits required, a statement sworn to of the proportion of the capital stock of said corporation which is represented by its property located and business transacted in Missouri, which statement shall set out the location of its principal office or place in this state for the transaction

of its business, where legal service may be obtained upon it. Such corporation shall be required to pay into the state treasury upon the proportion of its capital stock represented by its property and business in Missouri, incorporating tax and fees equal to those required of similar corporations formed within and under the laws of this state, with an addition of ten dollars as a fee for issuing the license authorizing it to do business in this state. Upon compliance with these provisions by the corporation the Secretary of State shall give a certificate that said corporation has duly complied with the law, and is authorized to engage only in the business set out in the statement filed with its charter. * * * Provided, that the provisions of this article are not intended to and shall not apply to 'drummers' or traveling salesmen soliciting business in this state for foreign corporations which are entirely nonresident. * * *

"Sec. 3040. * * * Every corporation for pecuniary profit, formed in any other state, territory or country, now doing business in or which may hereafter do business in this state, which shall neglect or fail to comply with the conditions of this law, shall be subject to a fine of not less than one thousand dollars, to be recovered before any court of competent jurisdiction; * * * in addition to which penalty, on and after the going into effect of said sections no foreign corporation, as above defined, which shall fail to comply with said sections, can maintain any suit or action, either legal or equitable, in any of the courts of this state, upon any demand, whether arising out of contract or tort: Provided, that the provisions of this section shall not apply to railroad companies which have heretofore built their lines of railway into or through this state; nor to 'drummers' or traveling salesmen soliciting business in this state for foreign corporations which are entirely nonresident."

The business, as transacted by the plaintiff and defendant, under these contracts was as follows: Plaintiff had the country divided into various circuits. New York being the office of the Eastern circuit, Chicago of the Central, and Denver of the Western. News gathered in all parts of the country would be filed in these main offices and sent out; for instance, that filed in the Chicago office would be sent out over the leased wires of the plaintiff and received simultaneously by its clients within that circuit. Plaintiff had a wire running from the defendant's building to its main leased wire, which ran through St. Louis. It kept and maintained an operator in the building of the defendant, who received the news which passed over the leased wires within the circuit, copied it off with a typewriter, and delivered it to the telegraph editor of the defendant, who would use such portions of it as he desired. The plaintiff also had what it called a "pony" service, which consisted in the boiling down or condensing of news which came over the leased wire to from one-fourth to one-fifth of the original amount. This would be sent to clients in smaller towns in Missouri not desiring full reports. The defendant had correspondents of its own in the several towns in the state, from which it received its Missouri news. The news which it received from the plaintiff was that which came from other parts of the country over its leased wire. The evidence clearly shows that, as to the business transacted between the plaintiff and the defendant, under the contracts in question, it was entirely interstate. Such being the case, the foregoing statutory provisions were clearly inapplicable.

In the case of International Text-Book Co. v. Gillespie, 229 Mo. 397, 129 S. W. 922, it appeared that the plaintiff, International Text-Book Company, was a corporation of the state of Pennsylvania; that

it taught pupils throughout the country by a system of correspondence; the students would execute a contract and forward it to the principal office in Pennsylvania for approval. In that case, Gillespie, one of its students, who lived in Missouri, declining to make payment according to the terms of the contract into which 'he had entered with the plaintiff, the plaintiff brought action upon such contract, and the defense interposed was that the contract was void and nonenforceable, because the plaintiff did business within the state of Missouri without having complied with the provisions of the statute before referred to. It appeared that the plaintiff, a foreign corporation, had not complied with the statute. The evidence showed that the International Text-Book Company, the plaintiff, maintained, in the state, a district superintendent, nine division superintendents, and three solicitors in each division, one district office, and nine division offices, in which were clerks and stenographers. The business of the parties engaged in these local offices was to solicit pupils for the correspondence school. These pupils were taught through correspondence with the main office in Pennsylvania, books were furnished by plaintiff to the pupils for use (though not purchased by the pupils). The Supreme Court held that, while the plaintiff, the International Text-Book Company, did business within the state of Missouri, such business was interstate, not of a domestic character, that the corporation was not required to comply with the provisions of the before-mentioned statute, and could recover upon the contract. The court, after reviewing many authorities, said:

"That while appellant is doing business in this state, yet the evidence shows that its business is confined to ·interstate business alone. That being true, it is not subject to state regulation within the meaning of said section of our statutes, but is governed by the Constitution of the United States, and. the laws thereof. We therefore hold said sections to be unconstitutional, null, and void in so far as they apply to and affect appellant and all foreign corporations engaged in interstate commerce."

It is clear from this decision of the Supreme Court of the state that the statute has no application to contracts relating wholly to interstate business, and, as the business done between the plaintiff and defendant in the case before us was wholly of an interstate character, such contracts were unaffected by the statute. The fact that the plaintiff may have furnished some of its "pony" service to clients within the state, and as to them the business was intrastate, in no manner affected the validity of the contracts in question, as these con· tracts related wholly to interstate business. The news which defendants collected within a radius of 15 miles of the city of St. Louis and delivered to plaintiff was used in interstate commerce, and the business done between plaintiff and defendant ·in pursuance of the contracts was interstate. If the provisions of the statute already referred to could be held to apply to the contracts in question, such statute would be unconstitutional under the authority of Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649, Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355, and International Text Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 24 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103. To the same effect, Dunlop v. Mercer, 156 Fed. 545, 86 C. C. A. 435. We are clearly of the

opinion that the contracts in question were valid, and the rights of the parties thereunder legally enforceable.

[2] The oral conversation shown by the testimony to have taken place between Mr. Taylor, the manager of defendant, and the operator of plaintiff, in St. Louis, was clearly insufficient to constitute a notice of termination of the contract. The letter of July 5, 1910, by the defendant to the plaintiff, had it been received by the plaintiff, was insufficient as a notice of discontinuance of the contract, because of being indefinite and uncertain, in that it stated that it was the present *intention* of the defendant to discontinue, not that it *would* discontinue, the contracts. Carpentier v. Thurston, 30 Cal. 123. While the evidence of the defendant was that this letter was duly addressed to the plaintiff, stamped and mailed in the United States mails in St. Louis, the evidence of the plaintiff was that it was never received. The court instructed the jury upon this subject that:

> "The law presumes that a letter written in St. Louis, put in an envelope with a United States postage stamp placed on the envelope and directed to a party in New York—the presumption of the law is that that letter, being so written, so stamped, and so deposited, reached its destination, and that it was received by the party to whom it was addressed. That is the presumption or prima facie evidence only. That presumption or prima facie case may be rebutted by plaintiffs showing that no such letter was received in New York. You have heard all of this testimony in reference to the matter. You have heard the letter read from the manager of this plaintiff association, to the manager of this defendant association here in October, saying that no such letter had been received. You have heard the testimony read from these depositions of the employés of the office in New York. If that letter was in fact received at New York, the court holds that the language of the letter is sufficient under these contracts to terminate the contracts."

The question as to the receipt of the letter was fairly submitted to the jury, with the statement that if it was received the contracts were terminated. The verdict of the jury was necessarily a finding that the letter was not received by the plaintiff. No evidence was offered tending to show that there had been a settlement and adjustment between the parties.

[3] Objection is made to the rule of damages for breach of the contracts. The court instructed the jury that, if they found for the plaintiff any damages for the alleged breach of the contracts, they should ascertain those damages at the difference between the contract price and the cost of maintaining the St. Louis office. The defendant contends that the profits were not the difference between what the plaintiff was entitled to receive under the contracts and what it cost to maintain the St. Louis office, but there should be deducted from what it would have received under the contracts, not only the expense of the St. Louis office, but a relative proportion of the expense of the entire business of the plaintiff. We think the measure of damages, as stated by the court, the correct rule. United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; United Press v. Abell Co., 79 App. Div. 550, 80 N. Y. Supp. 454, affirmed 178 N. Y. 578, 70 N. E. 1110. The evidence discloses that the only extra expense to which plaintiff was put in performing its contracts with the defendant was the local expense incurred in maintaining the St. Louis office. All

other expense incurred by it was the same after the defendant ceased to accept its news.

Numerous objections were taken to the introduction of testimony on the part of plaintiff and to the exclusion of testimony offered by the defendant. This testimony related chiefly to the business done in Missouri through the "pony" service, the giving of the notice, and the measure of damages. In view of the law which we have herein announced, these objections are not well taken.

It appears, however, that plaintiff, upon its first cause of action only claimed a total sum of $1,061, with interest on $225. The jury awarded the plaintiff upon said first cause of action the sum of $1,-678.50, with interest amounting to $100.71. As this was $617.50, exclusive of interest, more than claimed by plaintiff in its petition upon its first cause of action, it follows that the judgment must be reversed, unless the plaintiff shall file in the court below a remittitur in the sum of $617.50, with the proportionate amount of interest, and file with the clerk of this court a certified copy of such remittitur within 30 days from the handing down of this opinion. If such remittitur is so entered, the judgment will be affirmed. If plaintiff does not enter such remittitur in the court below, and file a certified copy of the same in this court within the time mentioned, the judgment will be reversed.