## STATE v. SALT LAKE TRIBUNE PUB. CO.

No. 4389.   Decided Sept. 17, 1926.   (249 P. 474.)

*Dey, Hoppaugh & Mark and Marioneau & Hogan,* all of
Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty Gen., and *L. A. Miner,* Asst. Atty.
Gen., for the State.

188

FRICK, J.

The defendant was convicted of having violated the provisions of section 2, c. 145, Laws Utah 1921, as amended by chapter 52, Laws Utah 1923. In view of the importance of the case, we here insert the section in full. It reads:

"It shall be a misdemeanor for any person, company or corporation to write, print, publish, or circulate in any newspaper, magazine, periodical or circular, written, printed or published within the state of Utah, or any street sign, placard, or billboard, street car, package of merchandise other than the merchandise licensed in this act, or any other place of display, any advertisement of cigarette papers, cigars, chewing tobacco or smoking tobacco or any disguise or substitute of either of these except that a dealer in tobacco and cigars may have a sign on the front of his place of business stating that he is dealing in such articles, and excepting further that cigars, chewing tobacco and smoking tobacco may be advertised in any newspaper published within the state of Utah, provided, however, that nothing herein shall be so construed as to permit advertising of cigarettes in any manner.

"Nor shall any cigarettes or cigarette papers, or any advertisement thereof, be displayed in any store window, in the state of Utah, provided however, that nothing in this section contained shall be construed so as to prohibit the display of tobacco and the advertisements thereof other than cigarettes and the advertisements thereof, in store windows."

The advertisement published by the defendant, and which the district court found constituted a violation of said section 2, reads as follows:

"Lucky Strike is the only cigarette out of over 200 brands with a definite and distinctive reason for its unique flavor. That's BECAUSE IT'S TOASTED.

"Toasting is a costly process—but it brings out the hidden flavors of the world's finest tobaccos. A final refinement that adds to your pleasure.

"There are countless cigarettes on the market—we've counted over 200 brands. Yet only one offers that rare toasted flavor. There's only one Lucky Strike—only one with such a distinctive charm. Because IT'S TOASTED—a reason millions can't resist."

In addition to other jurisdictional facts, the following

agreed statement of facts was submitted to the district court, to wit:

"It is hereby stipulated and agreed between the state of Utah and the Salt Lake Tribune Publishing Company that, as part of the record in the above-entitled cause, the following facts may be treated as part of said record as though incorporated in the complaint herein, and that the cause may be submitted on demurrer with the following facts conceded, as though the complaint were amended and such facts were included in the complaint, and that in the trial, the ruling of the court upon the demurrer, and in the judgment entered, the facts hereinafter stated may be assumed and are conceded and treated as though the complaint formally set forth said facts, viz.:

"(1) That at the time stated in the complaint herein and for a long time prior thereto the Salt Lake Tribune Publishing Company was and it still is a corporation organized under the Laws of the state of Utah, and the owner and publisher of a daily newspaper at Salt Lake City, Utah, known and designated as the Salt Lake Tribune, engaged in the business of receiving and publishing for hire advertisements to be published in its said newspaper, including among said advertisements, advertisements of cigars, cigarettes, and tobacco shipped and transported to and through the several states and territories of the United States and foreign nations, other than the states, territories, and foreign nations in which said articles were produced or manufactured. That the defendant for a long time prior and at the times stated in the complaint herein and ever since has many thousand suscribers in the states of Utah, Idaho, Montana, Colorado, Wyoming, Nebraska, Iowa, Indiana, Illinois, Nevada, California, Oregon, and Washington, and the other states, territories and foreign nations other than the several states and territories of the United States and in foreign nations. That the said newspaper was at all of said times and it still is sold and delivered by defendant to its various subscribers and readers in the said several states by means of the United States postal service, railway express companies, and by carriers, who, as agents of defendant, deliver it to the various homes of said newspaper subscribers, and that the said newspaper is also sold by newsboys or agents of defendant on the streets of the cities of the several states, and by newspaper dealers who are agents of defendant, various hotels, drug stores, and other places of business in the cities of the said several states, and by newsboys on railway trains passing to and through the said cities of the said several states.

"(2) That the American Tobacco Company is a corporation created and existing under the laws of the state of New Jersey, and as a large and important part of its business it is there engaged in interstate

and foreign trade and commerce of the United States in the manufacture and sale of tobacco and cigarettes, and in shipping, transporting, and selling the same from the place of manufacture, in the original packages as manufactured, to and through the several states and territories of the United States and foreign nations, other than the states in which said articles were and are produced or manufactured. That among its advertisements the defendant, at the times stated in the complaint herein, and for a long time prior thereto had contracts with, and undertook for hire to publish for, the said American Tobacco Company the advertisements set forth in the complaint, of the Lucky Strike cigarette, which advertisement was on Friday, October 2, 1925, published in the regular daily issue of the Salt Lake Tribune, published and printed by the said defendant company, which said newspaper was published and circulated as a subject of commerce and shipped, transported, sold and delivered as hereinbefore stated to purchasers, subscribers, and readers in the state of Utah, and to subscribers, readers, and purchasers in the several states and territories of the United States and in foreign nations; the same being transported to and through, and sold and delivered in several states and territories of the United States and in foreign nations, other than the state of Utah in which said daily newspaper is printed."

## Chapter 52, aforesaid, provides:

"It shall be unlawful for any person, firm or corporation to barter, sell or offer for sale, cigarettes or cigarette papers in the state of Utah, without first having obtained a permit therefor, which said permit may be granted and issued by the board of city commissioners of any city of the first or second class, the city council of any city of the third class, the board of trustees of any town, or the board of county commissioners in any territory outside of any city or town. Said permit shall be in force and effect for one year from and after the date of issuance, unless sooner revoked, and shall be granted only to a person, firm or corporation owning or operating the place from which such sales are to be made, which place shall be within the territorial limits of the body granting such permit.   *   *   *

"No permit sall be issued until the applicant therefor shall have filed with the city recorder, or clerk of the body issuing said permit, a bond to be approved by the board of county commissioners, board of city commissioners, or city council, as the case may be, which said bond shall be payable to the city, town or county issuing such permit, for the benefit of all parties interested, and shall be in the amount of five hundred ($500.00) dollars and conditioned upon the faithful observance of all the provisions of this act, and for the payment of all damages that may result from the unlawful sale of cigarettes or

cigarette papers. Said bond shall be signed by the obligor as the principal and by a surety company authorized to do business in this state. * * *

"Any person who shall furnish to any minor under twenty-one years of age, by gift, sale or otherwise, any cigarette or cigarette paper or wrapper, or any paper made or prepared for the purpose of making cigarettes, or any tobacco of any kind whatsoever, shall be guilty of a misdemeanor, and shall be punished by fine of not less than twenty-five ($25.00) dollars, nor more than two hundred ninety-nine ($299.00) dollars, or by imprisonment in the county jail not exceeding six (6) months, or by both such fine and imprisonment."

Upon the facts and the provisions of law aforesaid, the district court found the defendant guilty and entered judgment that it be required to pay a fine of $100.

The defendant appeals from the judgment and insists that the same is erroneous and should be reversed for the following reasons: (1) That the statute upon which the conviction is based violates the provisions of article 1, § 8, par. 3, of the Constitution of the United States, relating to interstate commerce; and, (2) that the statute under which the defendant was convicted "is an arbitrary and unreasonable infringement of personal property rights, and an unwarranted oppressive interference with the liberty of contract, and is in violation of the Fourteenth Amendment to the Constitution of the United States."

In support of defendant's first proposition it cites and relies upon the following, among other cases: *Post Printing & Publishing Co. v. Brewster* (D. C.) 246 F. 321; *Star-Chronicle Publishing Co. v. United Press Ass'n,* 204 F. 217, 122 C. C. A. 489; *Schollenberger v. Pennsylvania,* 171 U. S. 16, 18 S. Ct. 757, 43 L. Ed. 49; *Western Union Tel. Co. v. Pendleton,* 122 U. S. 347, 7 S. Ct. 1126, 30 L. Ed. 1187; *International T. Co. v. Pigg,* 217 U. S. 91, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; *Butler Bros. Shoe Co. v. United States Rubber Co.,* 156 F. 1, 84 C. C. A. 167; *Preston v. Finley* (C. C.) 72 F. 850; *International Text-Book Co. v. Gillespie,* 229 Mo. 397, 129 S. W. 923; *International Text Book Co. v. Peterson,* 133 Wis. 302, 113

N. W. 730, 14, Ann. Cas. 965; *Lemke v. Farmers' Grain Co.,* 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458.

It is not deemed necessary to cite further cases, since the foregoing sufficiently illustrate the principles relied on by the defendant.

It is clearly held in several of the foregoing cases that the publication of a newspaper which circulates in different states of the Union, as stipulated in the instant case, constitutes interstate commerce and is protected by the so-called interstate commerce clause of the federal Constitution. Indeed, counsel for the state do not seriously contend to the contrary. It will therefore be assumed, for the purposes of this decision, that in publishing and circulating the Salt Lake Tribune the defendant was engaged in interstate commerce.

By referring to the decision in the case of *Post Printing & Publishing Company v. Brewster,* supra, it will be seen that the stipulated facts regarding the advertisement that was published in the paper circulated by the Post Printing & Publishing Company was in legal effect the same as the advertisement published by the defendant in the Salt Lake Tribune. True, the paper in that case which contained the advertisement was published in the state of Missouri. The paper, however, was circulated in the state of Kansas, in which state the advertisement there in question was contrary to the provisions of a statute similar to ours. The court held that the circulation of the paper in the state of Kansas, although published in the state of Missouri, constituted interstate commerce and was protected by the interstate commerce clause of the federal Constitution. True it is that it was there said that the sale of cigarettes was lawful in Missouri, where the paper was published. So is the sale of cigarettes lawful in the state where the Salt Lake Tribune is published. The sale of cigarettes is regulated, but in case the dealer therein complies with the provisions of our statute all sales that are made in compliance with the provisions of the statute are lawful. What is said in

*Post Printing & Publishing Co. v. Brewster,* respecting the power of the state to control or protect the sale of cigarettes and the right to publish advertisements, is applicable to the case at bar. In view of that, we take the liberty of quoting copiously from the opinion in the case, as follows:

"The sale of cigarettes in the state of Missouri, where the newspapers of plaintiff are published, is a lawful business, and the transmission by plaintiff of the intelligence where and on what terms cigarettes may be purchased by its subscribers, by way of advertisements inserted in such newspaper, is perfectly legitimate and proper. Further, it must be regarded as settled the sale of cigarettes in a foreign state to a citizen of this state, and their carriage from said foreign state into this state and hereby delivered in original packages in consummation of such sale made in a foreign state, is legitimate interstate commerce, which is beyond the power of the Legislature of this state to prohibit or unduly restrict or burden. *Austin v. Tenn.,* 179 U. S. 343, 21 S. Ct. 132, 45 L. Ed. 224; *State v. Lowry,* 166 Ind. 372, 77 N. E. 728, 4 L. R. A. (N. S.) 528, 9 Ann. Cas. 350. In other words, while the business of bartering, selling, or in any other manner disposing of cigarettes in this state, or the business of advertising in any manner by any one within this state of the business of selling or disposing of cigarettes, is by the act in question properly prohibited, yet by reason of the exclusive control of Congress over interstate commerce it must, I think, be held, as the conduct of interstate commerce in cigarettes may not by a state be prohibited or unreasonably burdened, it follows of necessity, the business of advertising such interstate commerce business, which advertising itself not only is a form of interstate commerce, but further adheres in the very conduct of the interstate cigarette business itself, is also beyond the power of the state to prohibit or make criminal and punish, and this for the reason it cannot be thought possible to make the advertisement of a lawful business unlawful and punishable as a crime. *Lyng v. Michigan,* 135 U. S. 161, 10 S. Ct. 725, 34 L. Ed. 150; *Crutcher v. Kentucky,* 141 U. S. 47, 11 S. Ct. 851, 35 L. Ed. 649; *In re Rahrer,* 140 U. S. 545, 11 S. Ct. 865, 35 [35] L. Ed. 572."

While the state of Utah could perhaps entirely prohibit the sale of cigarettes, in so far as the sales are not protected by the interstate commerce clause of the federal Constitution, yet, as already pointed out, Utah merely regulates the sale of cigarettes as it regulates the sale of many other ar-

ticles of merchandise. All sales of cigarettes which are made in compliance with the provisions of our statute are lawful. If it is lawful, therefore, to deal in and to sell cigarettes, why is it not lawful to inform those who may legally purchase an article where they may do so? It may be true that the state within its police power may, as a matter of regulation, seek to minimize the sale of an article the use of which it may deem injurious to the public health; and if it may do that, it may perhaps, regulate or prohibit the advertisement of such an article. Where, however, as is the case here, the article in question is an article of commerce which is protected by the interstate commerce clause of the federal Constitution, ñt may well be doubted whether the state can interefere with the sale of an article which is so protected. The conclusion therefore seems irresistible that, in view that the advertisement published by the Salt Lake Tribune in and of itself constitutes interstate commerce with which the state of Utah could not interfere, and further that the article likewise was protected both by the laws of Utah permitting its sale and to the extent that the article was shipped into the state in original packages was also protected from interference by the state, the defendant was clearly within its legal rights in publishing the advertisement, and that the statute in question constitutes an undue interference with interstate commerce and therefore cannot be upheld.

It is insisted by the Attorney General that the supposed protection we have just stated does not apply in this case. In support of that contention he cites and relies upon the following authorities: *State v. Bass Publishing Company,* 104 Me. 288, 71 A. 894, 20 L. R. A. (N. S.) 495; *Delamater v. South Dakota,* 205 U. S. 93, 27 S. Ct. 447, 51 L. Ed. 724, 10 Ann. Cas. 733; *Austin v. State,* 101 Tenn. 563, 48 S. W. 305, 50 L. R. A. 478, 70 Am. St. Rep. 703; *Austin v. Tennessee,* 179 U. S. 343, 21 S. Ct. 132, 45 L. Ed. 224; *State of Kansas v. Nossaman,* 107, Kan. 715, 193 P. 347, 20 A. L. R. 921; *Gundling v. Chicago,* 176 Ill. 340, 52 N. E. 44, 48 L. R. A.

230, affirmed in 177 U. S. 183, 20 S. Ct. 633, 44 L. Ed. 725. The Attorney General insists that in *State v. Bass Publishing Company* and in *Dalamater v. South Dakota,* supra, it was held that the states have the power to prohibit the advertisement of articles the sale of which is lawfully prohibited by the statute. A mere cursory examination of the decisions in those cases will demonstrate that they have no application where the facts and circumstances are like those in the case at bar. In the cases referred to, it was held that the state had the power to prohibit the advertisement of intoxicating liquors and to punish the offender. The decisions are, however, squarely based upon the so-called Wilson Act (U. S. Comp. St. § 8738). In those cases the power of the state to prohibit the advertisement of intoxicating liquors was upheld, for the reason that the Wilson Act expressly withdrew intoxicating liquors from the protection of the interstate commerce clause of the federal Constitution. Intoxicating liquors, therefore, since the passage of the Wilson Act, are no longer protected as articles of commerce, and hence the states have complete control respecting the disposition, sale, and advertisement of intoxicating liquors. As pointed out, however, by the Supreme Court of the United States, in *Austin v. Tennessee,* supra, such is not the case with tobacco and cigarettes. Tobacco and cigarettes still constitute articles of commerce and are protected by the interstate commerce clause of the federal Constitution, the same as all other articles of interstate commerce. The state may therefore not interfere with the sale of tobacco and cigarettes, where such sales constitute interstate commerce.

It is contended, however, that the sales made by the local dealers in cigarettes in Utah do not constitute interstate commerce and hence are not protected by the Interstate Commerce Act. But we are not dealing with the local sales of cigarettes nor with the local dealers in cigarettes. It is expressly stipulated that the American Tobacco Company is a coroporation of the state of New Jersey and that the advertisement in question was published pursuant to a contract en-

tered into between the company and the defendant. Under the ruling of the United States Supreme Court all sales by that company which were made in original packages are protected by the Interstate Commerce Act (U. S. Comp. St. § 8563 et seq.). Moreover, as we have seen, the publication of the advertisement itself constitutes interstate commerce and hence is also protected by that act. It seems reasonably clear to the mind of the writer that the cases relied on by the Attorney General not only do not support his contention, but, in view of the facts and circumstances, go far to support the contention of the defendant herein, namely, that it was clearly within its legal rights in publishing the advertisement in question. To hold otherwise we must hold that cigarettes, like intoxicating liquors, do not constitute articles of commerce and hence are not protected by the Interstate Commerce Act. Such manifestly is not the law.

In view of the foregoing we feel constrained to hold, and do hold, that section 2, of chapter 145, Laws Utah 1921, as amended by chapter 52, Laws Utah 1923, cannot be enforced against the contract in question in this case.

In view of the conclusions reached upon the first proposition, it is not necessary to pass upon the second one relied on by the defendant, and we express no opinion as to that.

The judgment of the district court is reversed and annulled, and the defendant discharged.

GIDEON, C. J., and THURMAN and CHERRY, JJ., concur.

STRAUP, J.

I concur, but on this further ground:

The defendant is the owner and publisher of the Salt Lake Tribune, a newspaper published in Salt Lake City. Under contract and for hire it published for the American Tobacco Company a manufacturer outside the state, an advertisement of the Lucky Strike cigarette, especially the claimed

"toasted" feature of it, which, as advertised, gave it a "distinctive charm" and a "unique flavor." For the publication of such advertisement the defendant was prosecuted, convicted, and adjudged to pay a fine of $100, and appeals. It contends that section 2 of the act referred to by Mr. Justice FRICK is an undue interference with interstate commerce, unlawfully abridges the right to contract, infringes upon property rights and the freedom of the press, and is legislative usurpation of power under the guise of what is called the police power of the state.

It is stipulated that the defendant, in the publication and distribution of its newspaper, and the American Tobacco Company, organized under the laws of New Jersey and engaged in the manufacture and transportation of tobacco and cigarettes, are each engaged in interstate commerce; that long prior to the publication complained of the defendant was under contract for hire with the American Tobacco Company to publish advertisements for it, including the advertisement complained of, in the defendant's newspaper sold and distributed in the several states and territories of the United States and in foreign countries.

Section 1 of the act makes it unlawful "for any person, firm or corporation to barter, sell or offer for sale, cigarettes or cigarette papers in the state of Utah, without first having obtained a permit therefor, which said permit may be granted and issued by" boards of city commissioners of cities of the first and second class, city councils of cities of the third class, and by boards of trustees of towns, or county commissioners in territory outside of any city or town, such permits to be in force for one year from the date of issuance unless sooner revoked; that, before a permit is issued, the applicant shall pay to the treasurer of the municipality issuing it an annual license fee of from $25 to $100, depending upon the territory or city in which the business is carried on, and give a bond of $500 for the payment of all damages that may result from the unlawful sale of cigarettes or cigar-

ette papers. The section further provides that the applicant is also required to pay to the state treasurer from one to two mills on each cigarette sold and from one-half to one cent on each package of cigarette papers sold.

Complaint is made only of the invalidity of section 2 of the act, and thus the invalidity of that section only is now under consideration.

The validity of it is upheld by the state on the theory that it is unlawful to sell cigarettes in the state, and that section 2 is but in furtherance thereof, and that both are within a proper exercise of the police power. But as is seen, it is not unlawful to sell cigarettes in the state. It is only made unlawful to do so without a permit. With a permit selling cigarettes is a lawful business, and everyone engaged therein is entitled to the same protection as one engaged in any other lawful business. However, it is argued that, though it be lawful to sell cigarettes with a permit, the Legislature nevertheless was authorized under its police power to prevent all advertisements of cigarettes, on the theory that the use of cigarettes is injurious to health, especially the youth, or inimical to good morals, and, by preventing advertisements of them, sales and the use of cigarettes are, though not prevented, yet restricted and limited.

For purposes of this case it may be assumed that the use of tobacco, including cigarettes, is injurious to the health, development, and growth of the youth. The act, however, forbids the furnishing to any minor by gift, sale or otherwise any cigarette or cigarette paper, or "any tobacco of any kind whatsoever." Thus forbidding advertisements of cigarettes and cigarette papers while permitting advertisements of all other forms of tobacco would seem not to affect, at least not to any substantial degree, the enforcement or violation of the part of the act forbidding by sale, gift, or otherwise the furnishing of any kind of tobacco, including cigarettes, to minors. Such feature may thus be eliminated as having no pertinency to the matter in hand. In what way,

then, may it be said that permitting advertisements of all kinds and forms of tobacco except cigarettes and cigarette papers, promotes public health, or public morals, or public welfare? If tobacco is injurious to public health or inimical to public morals or public welfare, and if it be compentent for the Legislature to so declare, then why not banish and prohibit the manufacture, sale and use of it? If only tobacco in the form of cigarettes is injurious to health or inimical to public morals or general welfare, and that the use of tobacco in all other forms is not, and again if it be competent for the Legislature to so declare, then why not banish the cigarette and forbid its manufacture, sale, and use? If, on the other hand, the use of cigarettes is no more harmful than the use of tobacco in any other form, then why throw restrictions around the one and not around the other? In other words, on what rational theory or basis may it be said that the Legislature may forbid all advertisements of cigarettes, but permit adlibitum all sorts of alluring and seductive advertisements of all other forms of tobacco. No attempt is made to show that to forbid the one protects health or promotes public morals or welfare, and that to permit the other promotes or is not injurious to public health or general welfare. It is said that advertising cigarettes tends to increase the sale of them. But so does advertising of all other kinds and forms of tobacco. So does advertising of any article or commodity. That is what advertising is for. It is to call an article or commodity, its description and quality, and place where it may be had into public notice. Without advertising, it may be doubted if the public would know as much of the lastest styles and fashions of the bargain and slack season sales, of the soap that floats, of the company that makes them when better automobiles are made, or of the "distinctive charm" and "unique flavor" of the Lucky Strike cigarette. We have been told that "advertising pays." I assume it does. That proper and effective advertisment is legitimate and is regarded as a requisite in carrying on a succcessful business of a commercial nature, and that with-

out it many commercial dealers and traders in a certain make of kind of goods of different choices of equal quality at the same place would fail may not be disputed. Thus, advertising may well be regarded a necessary incident to carrying on a successful business, almost as much so as the right to contract with respect to matters connected with the business or the management and conduct of it. And, if the business is legitimate and permitted to be carried on, I do not well see by what authority the Legislature may prevent proper and legitimate advertisment, any more than the making of contracts in connection with or in relation to the business.

This, in such aspect, brings me to the real question of what is meant by police power and when may an act be upheld on the theory of a proper exercise of it. The rule is well stated in 22 Am. & Eng. Ency. L. 938, to be that:

"In order that a statute or ordinance may be sustained as an exercise of the police power, the courts must be able to see (1) that the enactment has for its object the prevention of some offense or manifest evil for the preservation of the public health, safety, morals, or general welfare, and (2) that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend towards the accomplishment of the object for which the power is exercised. The police power cannot be used as a cloak for the invasion of personal rights or private property, neither can it be exercised for private purposes, or for the exclusive benefit of particular individuals or classes."

In 6 R. C. L. 237, the general rule is declared to be that:

"In order to sustain legislative interference by virtue of the police power under either a statute or a municipal ordinance, it is necessary that the act should have some reasonable relation to the subjects included in such power, and the law must tend, in a degree that is perceptible and clear, toward the preservation of the public welfare, or toward the prevention of some offense of the police power. The mere assertion by the Legislature that a statute relates to the public health, safety or welfare does not in itself bring that statute within the police power of a state; for there must be obvious and real connection be-

tween the actual provisions of a police regulation and its avowed purpose, and the regulation adopted must be reasonably adapted to accomplish the end sought to be attained. One application of the familiar rule that the validity of an act is to be determined by its practical operation and effect and not by its title or declared purpose is that a constitutional right cannot be abridged by legislation under guise of police regulation; since the Legislature has no power, under the guise of police regulations, to invade arbitrarily the personal rights and personal liberty of the individual citizens, or arbitrarily to interfere with private business, or impose unusual and unnecessary restrictions, or to invade property rights."

In the case of *State ex rel. v. Ashbrook*, 154 Mo. 375, 55 S. W. 627, 48 L. R. A. 265, 77 Am. St. Rep. 765, the court said:

"In order to sustain legislation of the character of the act in question, as a police measure, the courts must be able to see that its object to some degree tends towards the prevention of some offense or manifest evil, or has for its aim the preservation of the public health, morals, safety, or welfare. If no such object is discernable, but the mere guise and masquerade of public control, under the name of 'an act to regulate business and trade,' etc., is adopted, that the liberty and property rights of the citizens may be invaded, the court will strike down the act as unwarranted."

In the case of *Lochner v. New York*, 198 U. S. 45, 25 S. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133, the court said:

"It is impossible for us to shut our eyes to the fact that many of the laws of this character, while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are, in reality, passed from other motives. We are justified in saying so when, from the character of the law and the subject upon which it legislates, it is apparent that the public health or welfare bears but the most remote relation to the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose (citing cases). The court looks beyond the mere letter of the law in such cases (citing cases.)"

That there are limitations upon the exercise of police power has been frequently held. In the case of *Lawton v. Steele,* 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385, the Supreme Court of the United States held that the police power must be taken subject to the condition that the state cannot in its exercise for any purpose encroach upon the power of the general government or rights guaranteed by the state or federal Constitution. Whether the police power has been exercised within proper limitations, whether or not the law is reasonable, whether the particular measure is designed to further some governmental function, and whether an act bears any reasonable relation to the public purpose sought to be accomplished, are all judicial questions. 6 R. C. L. 242; *Mugler v. Kansas,* 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205.

The proposition is well put by the court in the case of *State v. Redmon,* 134 Wis. 89, 114 N. W. 137, 14 L. R. A. (N. S.) 229, 126 Am. St. Rep. 1003, 15 Ann. Cas. 408, that:

"A statute ostensibly passed in the exercise of police power must be judged by its natural effect and not by its proclaimed purpose. A statute which restrains the liberty or property rights of individuals, though ostensibly passed in the exercise of police power, cannot be held valid unless it has a real or substantial relation to some legitimate object of the police power which its provisions reasonably tend to accomplish," and, "if it were true that all police regulations are legitimate which are reasonable, and all are reasonable which the Legislature so wills, the Constitution, as to very much of the field of civil government, would be of no use whatever. The contrary has been the rule without any legitimate question since *Marbury v. Madison,* 1 Cranch, 137 [2 L. Ed. 60]."

In accordance with these views, what real or substantial relation to any legitimate object of police power do the provisions of the act under consideration tend to accomplish; or in what way does the regulation or restriction adopted tend to or is adapted to accomplish the end sought to be attained? I perceive no such connection or relation. As has been seen, it cannot be to protect public health, for it is not

claimed or demonstrated, nor is there any attempt to do so, that smoking cigarettes is any more harmful or offensive than smoking a pipe or cigar or cheroot, or chewing tobacco or snuffing it—and doubtless is less harmful than some of these. If, however, it be said that cigarette smoking is more harmful than tobacco smoking in any other form, then it is not perceived in what manner the portion of the act in question tends towards accomplishing the object for which the power is exercised, or in what way it tends towards the prevention of any offense or manifest evil, or has for its aim the preservation of public health, morals, or safety, or welfare. It does not prevent the manufacture or sale, nor use, of the cigarette. All that may be done ad libitum and without hindrance or restriction upon obtaining a permit which any one may obtain on paying the fee and filing a bond. If the use of cigarettes were thought to be injurious to health or public welfare, preventing the manufacture or sale or use of them would tend towards the accomplishment of the object for which the power is exercised; but that may not well be said of the act which, permitting the manufacture, sale, and use of cigarettes ad libitum, attempts to prevent only the advertising of them. The authorities teach that the act must have a direct relation, as a means to an end, and the end itself must be appropriate and legitimate, before the act can be held to be a valid exercise of the police power. *Lochner v. New York*, supra. In other words, the portion of the act complained of is in no sense appropriate or adapted to correct any evil, if there be one, nor to contribute in any substantial degree to public health, or morals, or welfare, and, if a police measure at all, it is one in name and pretense only and not in substance or effect.

I thus am of opinion that this portion of the act is not a proper exercise of the police power and therefore is invalid, and concur in a reversal of the judgment and a dismissal of the action.